**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GISELE DUNN,

Plaintiff,

v. CASE NO.:

ALVIN NIENHUIS, as SHERIFF of HERNANDO COUNTY, FLORIDA,

Defendant.
_______________________________________/

**COMPLAINT AND JURY TRIAL DEMAND**

Plaintiff, GISELE DUNN ("Plaintiff"), by and through undersigned counsel, hereby sues the Defendant, ALVIN NIENHUIS, as SHERIFF of HERNANDO COUNTY, FLORIDA, ("Defendant"), and alleges as follows:

1. This action is brought pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e)-2(a), as amended ("Title VII").

**JURISDICTION, PARTIES AND VENUE**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), because it is where all of the parties resided and where the events complained of occurred.

4. At all times material, Plaintiff is and was a resident of Hernando County Florida.

5. Defendant, Alvin Nienhuis, serving in his official capacity as Sheriff of Hernando County, Florida is responsible for the personnel policies and practices of the local law enforcement agency, the Hernando County Sheriff's Office ("HCSO"), and he exercises the requisite control over those policies and procedures as the agency head. The Hernando County Sheriff's Office is/was the primary law enforcement agency serving Hernando County, Florida. It is a government

agency and a Florida non-profit corporation with its principal place of business located at 18900 Cortez Blvd., Brooksville, Florida 34601.

6. Defendant employs more than 500 employees and is an "employer" within the meaning of the FCRA and Title VII.

7. Plaintiff was an "employee" of Defendant within the meaning of Title VII. Plaintiff is a female and a member of a protected class for purposes of Title VII.

8. On or about September 5, 2017, Plaintiff timely filed a written charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (Attached hereto as Exhibit A).

9. On or about August 28, 2019 the EEOC issued a Reasonable Cause Determination. Thereafter, the EEOC attempted to Conciliate the matter but was unsuccessful. The charge was then sent to the Department of Justice for Review. (Attached hereto see Exhibit B).

10. Plaintiff files this action within 90 days of having received a Notice of Right to Sue (attached hereto as Exhibit C). The Notice of Right to Sue was issued only after the EEOC concluded there was reasonable cause to believe Defendant terminated Plaintiff's employment due to her gender in violation of Title VII of the Civil Rights Act. Furthermore, the Notice of Right to Sue was issued only after Defendant refused the EEOC's invitation to mediate.

11. Plaintiff has exhausted all of her administrative remedies and has met all conditions precedent to filing this lawsuit.

**<u>GENERAL ALLEGATIONS</u>**

12. Defendant engaged in gender/sex discrimination and retaliation in violation of the FCRA and Title VII.

13. Plaintiff was hired by Defendant on or about May 2003 as a deputy sheriff assigned to the patrol division and was later promoted to a Patrol Sergeant in 2013.

14. On or about September 15, 2016, Plaintiff was one of eight deputies who were either dispatched or responded to a 9-1-1 call at 10264 Ridgetop Loop, Weeki Wachee, FL. The call was placed by a home care nurse who reported her patient, Joseph Schlosser, was not breathing normally and may have suffered a stroke. Plaintiff was the only female law enforcement officer at, or dispatched to, the scene. Male deputy James Devorak was the first responding deputy. As the first to arrive, Mr. Devorak obtained critical information, that Mr. Schlosser may have also been suicidal. He did not share the information with Plaintiff or others at the scene, a violation HCSO General Order 1021.00.

15. As the first to arrive on the scene, Mr. Devorak also learned Mr. Schlosser was an avid gun collector and that there were numerous guns in the home. This was also information he did not share with the Plaintiff or other arriving deputies before they arrived, a violation HCSO General Order 1021.00.

16. Devorak was also advised Schlosser had a Gatling gun at the front door and discovered Schlosser had a gun on his lap. Devorak failed to relay this information to anyone, including the Plaintiff, a violation HCSO General Order 1021.00.

17. While enroute to the scene, Plaintiff repeatedly inquired as to Deputy Devorak's location, to no avail. Plaintiff directly asked Deputy Devorak what his position was at the home, as well as generally asking any other deputies on the radio if he had previously stated his position. When no response was received, Plaintiff radioed again and inquired as to if Deputy Devorak was on the porch or inside the subject's home. No response was received. Despite location information being critically essential to Plaintiff's approach, Deputy Devorak never transmitted that he was sitting only a few feet away from the armed subject, a violation of HCSO General Order 1021.00.

18. Defendant's policies required Devorak pause and retreat to an area with more cover, and notify his Sergeant, the Plaintiff, over the radio of the confirmed presence of multiple firearms, including but not limited to the Gatling gun at the front door. Devorak did none of this, instead he entered the home alone. Devorak's negligence risked the lives of all who responded and was a clear violation of HCSO General Order 1021.00. According to said policy, deputies are expected to rely upon their experience, training, good judgment, etc., when making decisions. Devorak was an experienced deputy who should have been aware of the Hernando County Sheriff's Office's policies and procedures.

19. Once inside the home, Devorak began to communicate with Mr. Schlosser. Devorak noticed Mr. Schlosser in a seated position with a tablet in his lap. It was later discovered Schlosser was preparing a suicide note on the tablet. Schlosser quickly removed the tablet and displayed a loaded firearm in his lap. With the information received from Schlosser and the 911 call, Devorak should have made sure the firearm was completely out of Schlosser's reach, so emergency medical services could administer the proper treatment. Instead, Devorak merely asked the subject to remove the firearm from his lap. According an excerpt from the recorded radio traffic, Devorak said, "We're talking, but he has a gun on his lap and he refuses to put it on the table, be advised." Although Schlosser eventually put the gun on a side table it was still loaded and within arm's reach. In fact, he was later able to quickly grab it and point the gun at Plaintiff. Devorak's sworn interview with Internal Affairs investigators confirmed Schlosser was able to reach for the gun, un-holster it, and point it at Plaintiff within just a few seconds. Despite the close proximity of the loaded gun coupled with Schlosser's initial refusal of Devorak's direction to put it on a table, Devorak sat down just feet from Schlosser, a violation of HCSO General Order 1021.00.

20. Despite having an opportunity to move to an area of safety to continue negotiations with the mentally and medically impaired subject, Devorak did not take physical possession of the firearm, because "it was likely he had an additional in his possession." Devorak also admitted to an investigator from the Florida Department of Law Enforcement he turned his back on an armed subject.

21. Deputy Devorak used poor judgment and discretion when he turned his back on an armed subject to get a soda out of the refrigerator, twice. Mr. Schlosser's request for a soda was Devorak's opportunity to grab the loaded gun, find cover or even exit the home completely. Instead he chose to turn his back on an armed subject twice. In his Internal Affairs interview, Devorak stated, "In fact when he put the gun on the table, I probably could have grabbed it, but I'm like okay…he says he wants to talk, you know nice, calm demeanor, you know, and I'm like, okay, and I'm saying to myself, if I grab this gun, I lost his trust and now they'll be no talking, so I'm figuring kay, let's wait." Later in the interview, after Devorak reports giving the soda to the subject, he says, "And that's where he put the gun on and that uh, I'm like, I could grab this. I know I could. You know I could have snatched it in a second but I'm like, okay, it's in a holster. He's good, he's got a soda…" In his sworn interview with the Florida Department of Law Enforcement Interview he added "…So, as I'm standing there, I was like, I can probably grab the gun, I can probably grab it, but the thing is…I got a good rapport going with the guy, I don't want to lose that rapport yet…" During the same FDLE interview Devorak admitted he turned his back on an armed subject, a violation of HCSO General Order 1021.00.

22. Securing a weapon was far more critical than maintaining a perceived rapport with an armed subject. Although the gun was in its holster, it did not minimize the risk posed to all responding officers. Devorak not only violated the Defendant's policy but Crisis Intervention Training that dictated he should have secured Schlosser's gun to allow for medical evaluation.

23. Because Devorak provided no, or minimal information, Plaintiff believed him to be in direct contact with the mentally unstable, armed subject. Upon her arrival to the scene, Plaintiff armed herself with a designated "less than lethal" shotgun, loaded with "beanbag" rounds. Plaintiff advised her supervisor, Anthony Piarulli, a Lieutenant, of her plan to employ the use of a non-lethal methods.

24. After Plaintiff arrived Schlosser granted her permission to enter the home at which time she saw Schlosser's gun still within his reach. Plaintiff gave him multiple verbal commands to step away from the firearm, while having the less than lethal shotgun in plain sight. Schlosser refused and grew agitated, telling Plaintiff to stop pointing the shotgun at him. Plaintiff continued to ask Schlosser to move away from his gun. Instead, Schlosser grabbed the gun. In response, Plaintiff discharged the less than lethal shotgun twice, hitting Schlosser on his left thigh and stomach. After sustaining two bean bag rounds, Schlosser pointed his gun directly at Plaintiff and Devorak. Plaintiff and Devorak then shot Schlosser. Plaintiff fired six times, Devorak, three.

25. Mr. Schlosser was pronounced deceased as a result of the gunshot wounds.

26. Both Plaintiff and Deputy Devorak were placed on paid administrative leave after the incident on September 16, 2016, in accordance with agency policy. The FDLE and State Attorney's Office were notified.

27. The HCSO authorized an administrative inquiry into the incident to determine if the use of deadly force was in violation of policy. However, HCSO's investigation was suspended until the FDLE and State Attorney's Office concluded their own investigations. The State Attorney and FDLE investigations concluded the Plaintiff and Devorak were justified in their use of deadly force.

28. According to an FDLE interview with Schlosser's wife, the entire incident may have been a planned "suicide by cop." In fact, investigators later confirmed her suspicion when

Schlosser's suicide note was located. She requested the FDLE "apologize to the deputies for creating this scenario that led to the deputies taking a human life."

**ADVERSE EMPLOYMENT ACTIONS AND UNEQUAL TREATMENT**

29. On September 15, 2016 both the Plaintiff and Devorak were placed on administrative leave. Pursuant to standard operating procedure an Administrative Inquiry was conducted.

30. Both the State Attorney's Office for the Fifth Judicial Circuit and the Florida Department of Law Enforcement cleared Plaintiff and Devorak of violations of state law, concluding both were justified in their use of deadly force, in part because Schlosser pointed a loaded gun at them.

31. HCSO's own Administrative Inquiry concluded "The actions taken by Sergeant Dunn and Deputy Devorak at the time of the incident regarding the use of deadly force were within Hernando County Sheriff's Office policy; therefore both Sergeant Dunn and Deputy Devorak are EXONERATED."

32. Two months after being placed back on duty, and after HCSO Administrative Inquiry cleared Plaintiff and male deputy Devorak of misconduct, the Defendant initiated a second inquiry targeting only Plaintiff for the same conduct for which she was previously exonerated.

33. Unlike Plaintiff, no male deputies or sergeants were subjected to repeated investigations or reviews by Defendant.

34. Defendant was now conducting a formal Internal Affairs Investigation against Plaintiff. Although eight deputies, seven of whom were male, responded to the Schlosser home, the Internal Affairs Investigation focused only on one deputy, the Plaintiff and the *only* female deputy at the scene.

33. Male deputy Devorak violated Defendant's policy, specifically General Order 1021.00, Discretion of Sworn Personnel, when he failed to provide his female colleague, Plaintiff, with critical information about an armed individual, possibly multiple weapons present, the location of weapons and Schlosser's suicidal threats and even his own location at the scene. Defendant did not subject male deputy Devorak to an IA. Likewise, male Deputy Devork violated his Crisis Intervention Training when he did not address the critical issue of Schlosser's access to a loaded gun. However, Defendant did not subject male deputy Devorak to additional training, investigative scrutiny or an adverse job action for the CIT violation. Additionally, male supervisor Piarulli was subjected to no investigation at all for his failure to obtain critical information pursuant to his supervisory responsibilities during the Schlosser incident.

34. The Defendant's Internal Affairs Investigation 2016-IA-11 concluded the Plaintiff violated General Order 4020.00, Use of Control, General Order 1021.00 Discretion of Sworn Personnel, and Policy Statement 2007.00 Supervisory Responsibility. In so doing the Defendant, with absolutely no new evidence or apparent justification, contradicted its own earlier decision to place Plaintiff back on duty without restriction on October 4, 2016. Furthermore, although Devork clearly violated both General Orders 4020.00 and 1021.00 and his CIT training, Devorak, the male who first responded to the Schlosser scene was never subjected to an Internal Affairs Investigation. Likewise, male supervisor Piarulli also violated policy, specifically Policy Statement 2007.00, yet was not subjected to an Internal Affairs investigation and suffered no adverse job action.

35. On or about May 5, 2017, the HCSO notified Plaintiff of its intent to terminate her employment because of her conduct in the Schlosser shooting. In fact, despite exonerating Plaintiff with regard to her use of deadly force, Defendant attempted to coerce Plaintiff to sign a waiver accepting responsibility for the Schlosser shooting.

36. Plaintiff's employment was terminated June 20, 2017. At the time of her termination, Plaintiff was the only female Sergeant in the Defendant's patrol division, and one of the only two females in a law enforcement supervisory team of nearly 50.

**SIMILARLY SITUATED MALE DEPUTIES TREATED MORE FAVORABLY**

36. As it relates to material terms of employment, such as investigations, discipline, punishment, and termination, male deputies under the direction and supervision of the Defendant were treated more favorably than females. The following are examples:

(a) Under the jurisdiction and supervision of Defendant, approximately one year after the Schlosser incident, male deputies Scott Lamia, a Sergeant, and Phil Lakin, a Lieutenant, were dispatched to investigate and apprehend a bank robbery suspect. Unlike the incident in which Schlosser was armed with a loaded gun and a Gatling gun in his home, bank robbery suspect, Michael Chamberlain, was armed only with a knife, thus posing less risk to himself, deputies and the general public. Unlike Schlosser, male deputies Lakin and Lamia allowed Chamberlain access to one of their running, unlocked patrol cars. Unlike the Schlosser incident, multiple deputies surrounded Chamberlain. Unlike the Schlosser incident, Chamberlain was allowed to move freely to the point where he attempted to access Lakin's running, unsecured patrol car. When Chamberlain, completely outside the scope of General Order 4020, Use of Control, opened the door of Lakin's running and unsecured car, multiple male deputies opened fire discharging more than 40 rounds from multiple angels. In so doing they endangered the lives of every other deputy on the scene not to mention the general public, because multiple colleagues were in the direct line of fire. Unlike the Schlosser incident in which no Hernando County Sheriff's Office equipment was damaged by gunfire, multiple vehicles under Lakin and Lamia's command sustained significant damage due to gunfire from deputies. The hail of gunfire from all angles occurred because, unlike in the Schlosser incident, Lakin and Lamia never attempted to use less than lethal

alternatives. Defendant applied different standards to the male deputies responsible for the shooting and death of Chamberlain. Lakin and Lamia were not subjected to an Administrative Inquiry, then an Internal Affairs Investigation for the multiple violations of the Defendant's policies. Neither was subjected to additional scrutiny beyond the Administrative Inquiry. Neither male supervisory deputies were disciplined or subjected to any adverse job action. Lakin's and Limias' lack of supervisory responsibility pursuant Policy Statement 2007.00 placed numerous deputies at risk. But unlike the Plaintiff, Lakin, a lieutenant was never disciplined, not even reprimanded. The same is true for male deputy Lamia, a sergeant. Both were in supervisory roles when they lost control of the scene resulting in male deputies opening fire on a suspect causing his death.

(b) In May 2014 male Sergeant Christopher Calderon, who like the Plaintiff, was in a supervisory position at the time, neglected to respond to a call of a 69-year-old man burning his home down because he was being evicted. Calderon provided no guidance to the officers on scene pursuant to Policy Statement 2007.00, Supervisory Responsibility. Only after the situation deteriorated and deputies shot and killed the 69-year-old man did male deputy Calderon bother to appear at the scene. He was not subjected to discipline or any adverse job action.

(c) Approximately 10 months before the Schlosser incident two male deputies, Adam Lillibridge, a Sergeant and Stephen Miller, a Corporal shot and killed a suspect, who like Schlosser pointed a gun at deputies. Also, like the Plaintiff, who attempted to neutralize Schlosser with the use of less than lethal force, Miller did the same. In the Miller and Lillibridge incident, suspected armed robber Michael Hilber was shot and killed after allegedly robbing a Dollar General store. Like Schlosser, Hilber, was uncooperative, specifically refusing to come out of a shed where he was hiding. Miller used less than lethal force in the form of his K-9. The K-9 physically dragged Hilber out of the shed. In the process, he pointed his gun at deputies who then shot and killed him.

Unlike Plaintiff, neither male deputies Miller or Lillibridge were questioned for causing a suspect to become agitated with the use of less than lethal force. Likewise, neither male deputies Miller or Lillibridge were subjected to secondary Internal Affairs scrutiny. Unlike Schlosser who had a Gatling gun in his front door, Hilber was armed with a BB gun. The male deputies were subjected to no adverse job action.

(d) In another example of an officer violating General Order 1021, on February 20, 2017 an uncooperative man, Taylor Hodge, was armed with a knife, and like Schlosser refused commands to relinquish the knife. Hodge was suspected of an assault and trespassing. Hodge was seemingly unaffected by tasers and pepper spray and continued to walk along Duffeld Street, near Brooksville. At one point a random bystander was able to get between Hodge and male deputy James Desmond. Eventually Hodge made his way to the unsecured and running patrol car of male deputy Earnest Johnson. When Hodge was able to shift the patrol car, over which Johnson had no control per General Order 1021, he and fellow male deputy Desmond opened fire killing Hodge. Unlike the Plaintiff, neither male deputies were subjected to an Internal Affairs Investigation. Both males were exonerated and returned to duty.

37. From 2013 through 2018 there were 13 shootings involving deputies employed by the Defendant. Of the 13 shootings all were subjected to Administrative Inquiries. The Plaintiff, a female was the *only* employee to be subjected to an additional investigative review in the form of an Internal Affairs Investigation.

38. No similarly situated employees who were male, including Deputy Devorak, were subjected to similar adverse employment actions.

39. For five full years the Defendant conducted no Internal Affairs Investigations of a male deputy involved in a shooting.

40. No similarly situated male employees were disciplined for violating HCSO's

policies.

41. The above-described conduct constitutes discrimination and retaliation in violation of the Florida Civil Rights Act and Title VII.

42. Plaintiff has suffered damages for lost wages, lost benefits, emotional distress, public humiliation and embarrassment, depression and other damages as a result of this unlawful conduct.

43. Defendant's unlawful actions were intentional, willful, malicious and/or done in callous disregard for Plaintiff's rights.

44. Plaintiff has been required to retain the undersigned counsel to represent her in this action and is obligated to pay them a reasonable fee for their services.

45. Plaintiff requests a jury trial for all issues so triable.

**COUNT I**
**Gender Discrimination in Violation of Title VII 42 U.S.C. § 2000e-2**
**(Defendant ALVIN NIENHUIS, as SHERIFF of**
**HERNANDO COUNTY, FLORIDA)**

46. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 45 as though fully set forth herein.

47. Defendant's conduct as herein alleged violated Title VII, which prohibits discrimination on the basis of gender/sex.

48. Defendant committed multiple acts of gender/sex discrimination against Plaintiff that included adverse employment actions as outlined in the foregoing paragraphs, that include: (1) terminating her employment for violations of HCSO policies for which similarly situated males were not; (2) subjecting her to multiple investigations, specifically an Internal Affairs Investigation, when no similarly situated male deputies were likewise investigated, and (3) disciplining a female employee for policy violations that male employees were not subjected.

49. Defendant has engaged in a pattern and practice of repeated discrimination against the Plaintiff by denying her equal enjoyment of all benefits, privileges, terms and conditions of her employment, and treating her differently than similarly situated non-female deputies.

50. The foregoing actions of Defendant constitute discrimination against Plaintiff based upon her sex/gender. Plaintiff was subjected to disparate treatment based on her sex/gender and similarly-situated male employees were treated more favorably due to their sex or gender.

51. Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

52. As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered injury, to which Plaintiff is entitled to legal and injunctive relief. Plaintiff has been denied employment opportunities providing substantial compensation and benefits, thereby entitling her to injunctive and equitable monetary relief; and has suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendant's actions, thereby entitling her to compensatory damages.

59. By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies, including attorneys' fees and costs, available under Title VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

1. Enter a declaratory judgment that the practices complained of in this complaint are unlawful and violate Title VII;

2. Grant all injunctive relief necessary to bring Defendant into compliance with Title VII;

3. Order Defendant to pay the wages, salary, employment benefits, back pay, and front

pay, and other compensation denied or lost to Plaintiff by reason of the Defendant's unlawful actions, in amounts to be proven at trial;

4. Order Defendant to pay compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

5. Order Defendant to pay attorneys' fees and costs of the action; and

6. Grant any further relief that the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands trial by jury as to all issues.

Respectfully submitted,
**WHITTEL & MELTON, LLC**
/s/ William J. Sheslow
William J. Sheslow, Esq.
Florida Bar No.: 92042
11020 Northcliffe Boulevard
Spring Hill, Florida 34608
Telephone: (352)683-2016
Facsimile: (352) 600-7533
will@theFLlawfirm.com
pls@theFLlawfirm.com
jwalsh@theFLlawfirm.com
pleadings@theFLlawfirm.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of April 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of filing via electronic mail to all counsel of record.

*/s/ William Sheslow*
William J. Sheslow, Esq.