UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GISELE DUNN,

    Plaintiff,

v.                                              CASE NO. 8:20-cv-829-SDM-AEP

ALVIN NIENHUIS,
Sheriff of Hernando County, Florida,

    Defendant.
_____/

## ORDER

Fired by the sheriff for fatally escalating a tense but stable suicide intervention, former sergeant Gisele Dunn sues for sex discrimination under Title VII. Lacking direct evidence that the sheriff fired Dunn for being a woman rather than for aiming a shotgun at a senior citizen in a wheelchair, Dunn argues that the sheriff's declining to fire a male sergeant who directed a deputy to "cut a corner" in an affidavit permits an inference of sex discrimination. Because Dunn's conduct differs in "material respects" from the male sergeant's corner-cutting and because Dunn fails otherwise to craft a "convincing mosaic" of sex discrimination, the record warrants summary judgment for the sheriff.

## BACKGROUND

The following facts are either undisputed or resolved in the manner most favorable to Dunn. In 2003, a former sheriff of Hernando County hired Dunn as a patrol deputy. In 2013, Sheriff Nienhuis promoted Dunn to sergeant. (Doc. 39 at 43)

1. <u>The failed suicide intervention</u>

On September 15, 2016, a home healthcare agency called 9-1-1 after a nurse discovered Joseph Schlosser, sixty-nine years old, threatening suicide in his home. (Doc. 39-1 at 91) James Devorak, a Hernando County Sheriff's deputy on the Crisis Intervention Team, called Dunn, Devorak's supervisor, and stated that he would drive to Schlosser's home. (Doc. 40-1 ¶ 4) Dunn responded that she would arrive soon after Devorak. While driving to Schlosser's home, Devorak and Dunn learned from the police radio that Schlosser formerly served in law enforcement and collected guns, including a Gatling gun. (Doc. 40-1 ¶ 5)

At Schlosser's home, Devorak learned from Schlosser's nurse that Schlosser sat on a "screened-in" lanai behind the home. (Doc. 40-1 ¶ 6) After walking behind the home, Devorak saw Schlosser sitting in a wheelchair and writing on a notepad. (Doc. 40-1 ¶ 7) Devorak asked to enter the lanai, to which Schlosser responded, "Sure, come on in. I'm not going to harm you." (Doc. 40-1 ¶ 7) While entering the lanai, Devorak saw a holstered gun laying in Schlosser's lap and used the police radio to issue to all deputies a warning. (Doc. 40-1 ¶ 7) After Devorak entered the lanai, Schlosser invited Devorak to sit in a nearby chair. Devorak, however, requested that

Schlosser first place the holstered gun on a nearby table. (Doc. 40-1 ¶ 8) Acknowledging Devorak's request, Schlosser placed the holstered gun on the table, pushed the gun beyond his immediate reach, and asked Devorak to bring him a beverage from a refrigerator in the kitchen. (Doc. 40-1 ¶ 8)

Satisfied with the placement of the holstered gun, Devorak brought Schlosser a beverage, sat in a chair about six feet from Schlosser's wheelchair, and began talking with Schlosser. (Doc. 40-1 ¶ 9) After a few minutes, Devorak determined that Schlosser might attempt suicide and requested by radio that any reinforcing deputies "stage out front of the residence." (Doc. 40-1 ¶ 8) After about ten minutes of talking with Devorak, Schlosser disclosed that he was writing a suicide note when Devorak arrived. (Doc. 40-1 ¶ 9) Because Devorak believed that the presence of a sergeant would benefit his intervention, Devorak asked Schlosser whether "it would be ok[ay] . . . if my sergeant came and joined us," to which Schlosser responded "Yes." (Doc. 40-1 ¶ 10) By radio, Devorak told Dunn that Schlosser had invited her to enter the lanai. (Doc. 40-1 ¶ 10)

Upon her arrival at Schlosser's home, Dunn as the "ranking officer" became responsible under the sheriff's policy to obtain information from the deputies, to direct the conduct of the deputies, and to stabilize the situation until a higher-ranking deputy arrived. (Doc. 36-2 at 92; Doc. 39 at 129:20–25) After parking in the driveway, Dunn saw John Mathis, a "rookie" deputy, behind Schlosser's home. (Doc. 39 at 159:16–160:21) Without obtaining information from Mathis (or the nurse) about

the progress of Devorak's intervention, Dunn armed herself with a shotgun, loaded with "less-than-lethal" bean bags and walked behind the home. (Doc. 35-1 at 61)

Approaching the lanai, Dunn saw Devorak sitting near, and talking to, Schlosser but could not hear the conversation. (Doc. 39-1 at 82–83) After entering the lanai and observing the holstered gun placed beyond Schlosser's immediate reach, Dunn — before Devorak could speak — propped the shotgun on a railing, aimed the shotgun at Schlosser, and told Schlosser twice to "move away from the gun." (Doc. 39-1 at 26–28) Agitated, Schlosser yelled "Don't you point that thing at me," to which Dunn responded, "This is gonna hurt." (Doc. 35-1 at 123; Doc. 35-2 at 396–97) Schlosser began reaching for the holstered gun, which prompted Dunn to shoot Schlosser twice with the bean bags. (Doc. 35-1 at 395–96; Doc. 39-1 at 101) Angered but unsubdued, Schlosser in rapid succession grabbed and unholstered the gun; told Devorak, "I told you I'm not going to hurt you"; and aimed the gun at Dunn. (Doc. 35-1 at 292, 396) Dunn and Devorak immediately removed their sidearms and shot Schlosser nine times collectively. (Doc. 35-1 at 292, 396–98) Schlosser died, but the deputies remained unharmed.

B.  The state attorney's investigation

In accord with the sheriff's policy, a senior deputy placed Dunn and Devorak on paid leave until the State Attorney for Hernando County investigated whether the

deputies' lethal force complied with Section 776.012(2), Florida Statutes.[1] (Doc. 35-2 at 13, 16) After the investigation, a delegate of the state attorney found that Schlosser's refusing to move from the gun, that Dunn's attempting to subdue Schlosser by less than lethal force, and that Schlosser's aiming the gun at Dunn collectively justified lethal force under Section 776.012(2). (Doc. 35-2 at 21) However, determining whether the deputies also complied with the sheriff's policy remained "beyond the scope" of the state attorney's investigation. (Doc. 35-2 at 20)

3.     The Professional Standards Unit's investigation

After the state attorney's investigation, Lieutenant Kenneth Hayden, the supervisor of the sheriff's Professional Standards Unit, resumed an administrative inquiry to determine whether Dunn and Devorak complied with the sheriff's policy governing the use of lethal force. (Doc. 39-1 at 14; Doc. 39-2 at 7)

On January 19, 2017, the inquiry concluded, "In regards to the Use of Deadly Force (lethal), the deputies in this case acted within policy." (Doc. 35-2 at 10) But the inquiry acknowledged a pending internal affairs investigation to assess "policy or procedural violations preceding the authorized use of deadly force." (Doc. 35-2 at 10) Assigned by Hayden to conduct the internal affairs investigation, Inspector John Ellis in early January 2017 interviewed Dunn, who had retained a lawyer, and

---

[1] Under Section 776.012(2), "A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony. A person who uses or threatens to use deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use the deadly force is not engaged in a criminal activity and is in a place where he or she has a right to be."

seven other deputies. (Doc. 39 at 120:35-25) Six days later, Dunn requested sick leave to cope with "severe emotional and mental complications surrounding the fatal on-duty shooting." (Doc. 39 at 24:22–25:4) After the investigation, Inspector Ellis prepared an internal affairs report, which assessed Dunn's compliance with sheriff policy governing (1) the use of control, (2) supervisory discretion, (3) the discretion of sworn personnel, and (4) protective custody.

General Order 4020.00, Use of Control, authorizes the use of a less-than-lethal load in a shotgun to control a person "who is armed with a deadly weapon and is threatening suicide," "who is about to commit suicide or inflict serious bodily injury," or who is "threatening violence [and] other means of control have failed." (Doc. 39-1 at 10) Further, General Order 4020.00 specifies that "less than lethal munitions should not be used against" a person "confined to a wheelchair" unless "the totality of the circumstances dictates otherwise." (Doc. 35-1 at 52) The report finds that Dunn lacked authorization to use the less-than-lethal bean bags because upon entering the lanai Dunn "observed and confirmed [that] the firearm was not in Mr. Schlosser's possession," received "no indication [that Devorak] was being threatened or in need of immediate assistance," and "made no effort to obtain additional information from Deputy Devorak." (Doc. 35-1 at 54) The report finds that instead of "keeping the less-than-lethal shotgun at the low-ready and attempting to reassess the situation, [Dunn] immediately took aim at Mr. Schlosser . . . , [which] create[ed] a hostile environment in an otherwise calm situation." (Doc. 35-1 at 54) Concluding that Dunn "failed to consider the totality of the circumstances," which "had evolved

beyond simply a 'man with a gun,'" the report recommends sustaining a violation of General Order 4020.00, Use of Control. (Doc. 35-1 at 55)

Policy Statement 2007.00, Supervisory Discretion, charges a supervisor "with the responsibility of providing guidance and assistance to their subordinates." (Doc. 35-1 at 54) The report determines that Dunn's decision "to forego obtaining information or providing direction by the use of radio transmission or any other source significantly hampered the responding deputies['] ability to act when they arrived." (Doc. 35-1 at 54) The report finds that after arriving at Schlosser's home, Dunn saw Deputy Mathis but "made no effort to offer [Mathis] any guidance or assistance" and that after entering the lanai, Dunn saw "no indication [Devorak] was in distress" but "failed to obtain information" from Devorak before aiming the shotgun at Schlosser. (Doc. 35-1 at 54) Concluding that Dunn "fail[ed] to provide guidance and assistance to those subordinates on scene," the report recommends sustaining a violation of Policy Statement 2007.00, Supervisory Discretion. (Doc. 35-1 at 54)

General Order 1021.00, Use of Discretion, requires a deputy "to rely upon . . . experience, training, good judgment, and advice of supervisors." (Doc. 35-1 at 53) Finding that Dunn demonstrated poor judgment by deciding to aim the shotgun at an older man who "was in his home, in a wheelchair, unarmed, and offering no resistance until such time as he felt threatened," the report sustains a violation of General Order 1021.00, Use of Discretion. (Doc. 35-1 at 55)

Standard Operating Procedure 4600.00, Protective Custody, authorizes a deputy to detain a person suspected of mental illness to prevent the person's inflicting self-harm or harm to another. (Doc. 35-1 at 55) The report finds that Dunn lacked the opportunity "to observe and evaluate Mr. Schlosser" and apply the criteria for detention. (Doc. 35-1 at 55) Accordingly, the report finds "insufficient evidence to clearly prove or disprove" a violation of Standard Operating Procedure 4600.00. (Doc. 35-1 at 56)

After completing the report, Inspector Ellis transmitted the report and the investigatory file to Lieutenant Hayden, who concurred with the findings and transmitted the report and the investigatory file to Colonel Michael Maurer, the Chief Deputy. (Doc. 35-1 at 43; Hayden Tr. 16:1–7, Doc. 37) After reviewing the report and the investigatory file, in May 2017 Colonel Maurer recommended that the sheriff terminate Dunn. (Doc. 36-1 ¶¶ 19, 20) In accord with the sheriff's policy, Dunn received a written notice of the intent to terminate Dunn's employment and of the opportunity for a pre-termination hearing. (Doc. 36-1 ¶ 21)

Dunn requested a pre-termination hearing, which occurred June 14, 2017. At the hearing, Dunn submitted a supplemental memorandum, which offered more explanation for her deciding to aim the shotgun at Schlosser. (Doc. 36-1 ¶ 22) Primarily, the supplemental memorandum states that Dunn believed Schlosser's proximity to the gun placed Devorak in acute peril, which according to Dunn warranted an immediate threat of force to compel Schlosser to move farther from the holstered gun. (Doc. 36-2 at 107) Two days later, Inspector Ellis and Lieutenant Hayden prepared a

response determining that Dunn's supplemental memorandum presented no basis to alter the conclusion of the internal affairs report. (Doc. 36-1 ¶ 23; Doc. 36-2 at 117–121) After the pre-termination hearing and after reviewing the memoranda and the file, Colonel Maurer in a June 20, 2017 formal recommendation to the sheriff stated:

> According to her own testimony and that of witnesses, Sgt. Dunn was clearly not in control of this event from the start. She admits she didn't realize where personnel w[]ere positioned nor even who was on scene. She was fixated on misinformation and was experiencing a sever[e] episode of "tunnel vision". Again, by her own admissions, she clearly did not understand the event(s) at hand, nor did she attempt to obtain any additional information to ascertain the status of the call for service. She proved that she lacks the capacity to take responsibility for her conduct and actions. These are not acceptable actions of a Deputy Sheriff particularly a Supervisor.
>
> Therefore, based on the totality of the circumstances which highlight the egregious nature of this case, it is my judgement that her termination is the only appropriate outcome as no amount of retraining nor any other less restrictive response would adequately remedy the issue, nor would it appropriately serve the public good.

(Doc. 39-1 at 170) Sheriff Nienhuis accepted Colonel Maurer's recommendation and terminated Dunn. (Doc. 39-1 at 171)

On September 5, 2017, Dunn registered a charge of discrimination with the Equal Employment Opportunity Commission. After consideration of the record, the EEOC found a "convincing mosaic of circumstantial evidence . . . [of] discriminatory animus" based (1) on the decision to begin an internal affairs investigation even though the state attorney found justified and the administrative inquiry found authorized Dunn's use of lethal force and (2) on the decision to subject Dunn to the internal affairs investigation but not Devorak or any other deputy. (Doc. 1-1) After the sheriff rebuffed the EEOC's attempt at conciliation, the EEOC invited the Department

of Justice of to intervene, but the Department of Justice declined and issued Dunn a "notice of right to sue." (Doc. 39-1 at 192–94)

## DISCUSSION

Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, prohibits an employer's "discharg[ing]" an employee based on sex. If lacking direct evidence of discrimination, a plaintiff confronting summary judgment must either prevail under the "burden-shifting framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or demonstrate a "convincing mosaic" of circumstantial evidence under *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).

### I. Burden shifting under *McDonnell Douglas*

To prevail under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that the employer treated more favorably a "similarly situated" employee outside the plaintiff's protected class. *Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc). If the plaintiff identifies a similarly situated employee outside the plaintiff's class — a "comparator" — treated more favorably, the employer must present a legitimate, non-discriminatory reason for the favorable treatment. *Lewis*, 918 F.3d at 1221. If the employer presents a legitimate, non-discriminatory reason, the plaintiff must demonstrate that the presented reason serves as a pretext for discrimination. *Lewis*, 918 F.3d at 1221.

#### A. Dunn's *prima facie* case

To establish a *prima facie* case of sex discrimination, the plaintiff must demonstrate "(1) that she belongs to a protected class, (2) that she was subjected to an

adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220. The "comparator analysis must be conducted at the *prima facie* stage . . . and not relegated to the pretext phase." *Lewis*, 918 F.3d at 1220. The sheriff argues that Dunn fails to identify a comparator but concedes the other elements of Dunn's *prima facie* case.

Although the plaintiff and the comparator need not "be 'nearly identical,'" the plaintiff and the comparator must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218 (rejecting en banc the "nearly identical" standard from *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984)). Typically, the comparator (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff," (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff," (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor" as the plaintiff and (4) "will share the plaintiff's employment or disciplinary history." *Lewis*, 918 F.3d at 1228 (reminding that an inference of discrimination results from an employer's treating "like" cases "differently"). The comparator analysis must afford the employer ample "breathing space to make appropriate business judgments." *Lewis*, 918 F.3d at 1223, 1228.

Endeavoring to establish a *prima facie* case, Dunn contends that another sergeant, Matthew Lillibridge, "was similarly situated in all material respects" but received a suspension instead of termination. (Doc. 66 at 24) His story follows.

While on duty in June 2016, Sergeant Lillibridge and Deputy Durkin, then a rookie, encountered Shawn Horn, a civilian, who allowed Lillibridge to search Horn's backpack. (Doc. 37-1 at 15–16) Inside the backpack, Lillibridge found a first aid kit containing a syringe and a spoon, which appeared to contain the residue of methamphetamine. (Doc. 37-1 at 16) Professing ignorance about the first aid kit, Horn asserted that the spoon belonged to a "friend" but "guessed" after questioning that the residue was methamphetamine. (Doc. 37-1 at 19) However, neither Lillibridge nor Durkin had a field test kit with which to test the spoon. (Doc. 37-1 at 16) Lillibridge, however, construed Horn's "guess" as an admission and arrested Horn for possessing paraphernalia. (Doc. 37-1 at 16) Lillibridge assured Durkin that "they would test [the spoon] later" and instructed Durkin to transfer Horn to the Hernando County Jail and to submit an affidavit stating that the spoon had tested positive for methamphetamine. (Doc. 37-1 at 16–18) After submitting the affidavit to the officials at the jail, who detained Horn without bond because possession of paraphernalia violated Horn's probation, Durkin realized that he had accidentally left the first aid kit and spoon at the scene of Horn's arrest. (Doc. 37-1 at 16) After Durkin informed Lillibridge about the missing first aid kit, the deputies returned to the scene of Horn's arrest but could not find the first aid kit. (Doc. 37-1 at 16)

The next day, Lillibridge told a state prosecutor that the deputies had lost the spoon and that the affidavit supporting Horn's arrest falsely stated both that the deputies had tested the spoon and that the spoon had tested positive for methamphetamine. (Doc. 37-1 at 20) The state prosecutor filed in state court an "announcement

of no information" on the charge for possession of paraphernalia and moved to dismiss the charge for violation of probation. (Doc. 37-1 at 18) The state court granted the motion and dismissed the charges against Horn.

In July 2016, Colonel Maurer assigned Lieutenant Hayden to conduct an internal affairs investigation into Sergeant Lillibridge's arrest of Horn. After interviewing several deputies, Lieutenant Hayden prepared an internal affairs report, which recommended sustaining against Sergeant Lillibridge (1) a violation of Policy Statement 1022.10, Presentation of Evidence, which requires a deputy to present "evidence impartially and without malice," and (2) a violation of Policy Statement 2007.00, Supervisory Discretion, which charges a supervisor with "providing assistance and guidance" to ensure a supervised deputy complies with the sheriff's policy. (Doc. 37-1 at 12) After reviewing the report, Colonel Maurer sustained the violation of Policy Statement 2007.00, Supervisory Responsibility, and in a memorandum to Lillibridge stated, "You attempted 'to cut a corner' and the results were disastrous. Most disturbing to me is you did this with a new deputy sheriff when in fact you should be mentoring and training with the highest standards in mind." (Doc. 37-1 at 5) Colonel Maurer subjected Lillibridge to an unpaid, three-day suspension and warned, "Future violation will result in progressive discipline up to and including your termination." (Doc. 37-1 at 4) Later, both Colonel Maurer and Lieutenant Hayden testified that Lillibridge's conduct also violated the sheriff's policies governing the use of discretion, policies that the January 2017 internal affairs report found that Dunn had violated. (Doc. 46 at 26:7–10)

Contending that under *Lewis* Dunn and Lillibridge are "similarly situated in all material respects," Dunn notes that Dunn and Lillibridge both served as sergeant; both were subject to an internal affairs investigation; both were investigated under the authority of Lieutenant Hayden; both were subject to a sustained violation under Policy Statement 2007.00, Supervisory Discretion; and both were disciplined with the sheriff's approval. (Doc. 66 at 6–10) Dunn contends that the different punishment — Lillibridge's three-day suspension versus Dunn's termination — permits an inference that the sheriff fired Dunn based on sex.

Although Dunn demonstrates that Dunn and Lillibridge share some similarities, Dunn fails to show that Dunn and Lillibridge are "similarly situated in all material respects" under *Lewis*, 918 F.3d at 1218. No lengthy elaboration must precede the unstartling observation that improvidently threatening force is not "the same basic conduct" as directing a subordinate to "cut a corner" in an affidavit. *Lewis*, 918 F.3d at 1228. This unstartling observation conforms not only to common sense but also to the sheriff's policy, which governs in detail the use of force continuum (lethal force, non-lethal force, use of control, the use of a less-than-lethal load) but contains a general admonition against dishonesty. The misconduct is distinct in kind, distinct in the law, and distinct in the sheriff's policy. The dissimilarity between improvidently threatening force and directing a subordinate to "cut a corner" precludes any inference that Lillibridge's lesser punishment resulted from discrimination based on sex.

Further, *Lewis* holds that the proposed comparator "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor." Although Dunn's termination required Sheriff Nienhuis's approval, Lillibridge's discipline required only Colonel Maurer's approval, and Sheriff Nienhuis neither reviewed nor authorized nor ratified Lillibridge's discipline. (Doc. 34 at 16:13–16; 17:11-15) The dissimilar supervisory jurisdiction further confirms the unsuitability of Lillibridge as a comparator.

### B. The sheriff's legitimate, non-discriminatory reason and the absence of pretext

Although the dissimilarity between Lillibridge's and Dunn's misconduct eliminates Lillibridge as a comparator, the sheriff also presents a legitimate, non-discriminatory reason for firing Dunn, who fails to demonstrate that the presented reason serves as a pretext for discrimination. As Colonel Maurer found persuasively in his termination memorandum, Dunn's deciding — without first obtaining information from other deputies — to aim a shotgun at a senior citizen, who was sitting in a wheelchair and in his home, sipping a beverage, and conversing with a member of the Crisis Intervention Team, demonstrated "severe . . . tunnel vision" and a lack of judgment not susceptible to remediation. Although Dunn contends that the failure to afford "progressive discipline" constitutes a basis for finding the presented reason pretextual, the sheriff's policy excepts misconduct from progressive discipline if "the seriousness of the violation dictates a harsher action." (Doc. 35 at 82:1–23) Even

construed most favorably to Dunn, her policy violations fit comfortably within the "severity" exception for progressive discipline.

## II. A "convincing mosaic" under *Lockheed-Martin*

Dunn contends that certain aspects of the sheriff's investigation comprise a "convincing mosaic" of discriminatory intent. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[A] plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'")  First, Dunn contends that the decision to resume an "administrative inquiry" into Dunn's use of lethal force despite the state attorney's finding that Dunn complied with Florida's criminal law suggests intentional sex discrimination.  But the state attorney avowedly investigated Dunn for compliance with Florida's criminal law governing the use of lethal force and not for compliance with the policy of the sheriff, who, of course, remains free to impose a higher standard governing a deputy's use of lethal force.  Also, both Dunn and Devorak were subject to the administrative inquiry, and both Dunn and Devorak were determined to comply with the sheriff's policy governing the use of lethal force.

Second, Dunn contends that the decision to begin after conclusion of the administrative inquiry an internal affairs investigation — into Dunn only — suggests intentional sex discrimination.  Although Dunn shows that Devorak and other deputies at Schlosser's residence might have committed ancillary policy violations preceding the use of lethal force, only Dunn committed a "level three" violation under the policy and only Dunn committed a violation bearing a causal relation to Schlosser's

- 16 -

death.  Easily explained by the severity of Dunn's violation, the decision to subject Dunn but not Devorak or any other deputy to an internal affairs investigation yields no suggestion of sex discrimination.

Third, Dunn contends that Sheriff Nienhuis terminated Dunn against his will. Specifically, Dunn cites the deposition transcript of Deputy Van Syckle, who testified that on June 16, 2017, Sheriff Nienhuis told Van Syckle that Sheriff Nienhuis "was under a lot of pressure to terminate [Dunn], but because of the fact that there was nothing to support it in evaluation, that he wasn't justified in doing so." (Doc. 65 at 21:24–22:15)  Even if Sheriff Nienhuis remained unconvinced that Dunn's conduct warranted termination and terminated Dunn due to pressure from subordinate deputies, nothing in the record remotely suggests that the "pressure" to terminate Dunn resulted from a discriminatory animus rather than Colonel Maurer's determination that Dunn's lack of judgment in the field demonstrates no hope of remediation.  In fact, Deputy Van Syckle testified that she was "not aware of any evidence of discriminatory attitudes or motives . . . that related to Ms. Dunn, her employment, or her termination from the Sheriff's Office[.]"  (Doc. 65 at 24:21–25:1)

No reasonable jury could infer from the circumstantial evidence cited by Dunn that intentional sex discrimination motivated Dunn's termination.  Dunn distinctly fails to assemble a "convincing mosaic."

## CONCLUSION

Dunn fails to identify a comparator, fails to demonstrate pretext, and fails to assemble a "convincing mosaic."  Sheriff Nienhuis's motion (Doc. 33) for summary

judgment is **GRANTED**.  The clerk must (1) enter judgment on Count I in favor of Sheriff Nienhuis and against Gisele Dunn and (2) close the case.

ORDERED in Tampa, Florida, on January 12, 2022.

*[signature]*

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE